

# New York Province
## of the Society of Jesus

## Jesuits

Following Jesus, Jesuits feel called not only to bring direct help to people in distress, but also to restore entire human persons in their integrity, reintegrating them in community and reconciling them with God. The grace Jesuits receive is to be and go with Christ, looking on the world with his eyes, loving it with his heart, and entering into its depths with his unlimited compassion.

*General Congregation 34, Decree 2*





*Fr. Joseph McShane, SJ, President of Fordham University, distributes communion at last year's Mass for incoming freshmen and their families.*



**2009-2010 Jesuit Calendar**
Call: 212-774-5500
Email: development@nysj.org
*[Sample Pages]*

---

*Make a donation*
*to our*
*2010*
*Annual Campaign*

---



**Five Jesuits Profess First Vows**



CARITAS
IN
VERITATE



**Justice Issues Today**

---

# NEWS
## New York Province

 Mt. Manresa Jesuit Retreat House, Staten Island, presents its September events schedule.

 Saint Ignatius Jesuit Retreat House, Manhasset, presents its fall schedule of weekend retreats, a series on Ignatian Spirituality, and a special afternoon - *Everyone Belongs* - for the families and friends of gays and lesbians.

Alumni/ae of any Jesuit institution who live in the greater New York area are invited to a gathering on "Discovering our Jesuit Identity Rooted in Ignatian Spirituality" at St. Ignatius Jesuit Retreat House, Manhasset, NY, Saturday, September 12.

 Loyola House of Retreats, Morristown, NJ, invites seniors to a Day of Prayer - "Look, I am doing something new." - conducted by Fr. Bill Rakowicz, SJ, on September 17.

News from the **Maryland** and **New England** Provinces.

The current TriProvince Vocation Newsletter.

A Vocation Prayer for August.

The British Jesuit Province has launched a designated web site to help men considering whether they have a vocation to the Society of Jesus.

A Modest Proposal: an editorial from *America* magazine "Silence and fervent prayer for vocations are no longer adequate responses to the priest shortage in the United States."

For insight into what you might do to encourage vocations, read "Making a Mark" by Fr. Richard Malloy, SJ, in *America* magazine.

Jesuits **Photo Gallery** of men who joined the Jesuits in the United States in 2008.

EXHIBIT A

The text of the Jesuit *Extreme Oath of Induction* is meticulously recorded in the Journals of the 62nd Congress. 3rd Session, of the United States Congressional Record (House Calendar No. 397. Report No. 1523. 15 February, 1913, pp. 3215-3216).

### (Text of the Jesuit Extreme Oath of Induction:)

I_____ , now in the presence of Almighty God, the blessed Virgin Mary, the blessed St. John the Baptist, the Holy Apostles, St. Peter and St. Paul, and all the saints, sacred host of Heaven, and to you, my Ghostly Father, the superior general of the Society of Jesus, founded by St. Ignatius Loyola, in the pontification of Paul the Third, and continued to the present, do by the womb of the Virgin, the matrix of God, and the rod of Jesus Christ, declare and swear that His Holiness, the Pope, is Christ's Vice-Regent and is the true and only head of the Catholic or Universal Church throughout the earth; and that by the virtue of the keys of binding and loosing given to His Holiness by my Saviour, Jesus Christ, he hath power to depose heretical Kings, Princes, States, Commonwealths, and Governments, and they may be safely destroyed. Therefore to the utmost of my power I will defend this doctrine and His Holiness's right and custom against all usurpers of the heretical or Protestant authority whatever, especially the Lutheran Church of Germany, Holland, Denmark, Sweden and Norway, and the now pretended authority and Churches of England and Scotland, and the branches of same now established in Ireland and on the continent of America and elsewhere and all adherents in regard that they may be usurped and heretical, opposing the sacred Mother Church of Rome. I do now denounce and disown any allegiance as due to any heretical king, prince or State, named Protestant or Liberal, or obedience to any of their laws, magistrates or officers. I do further declare the doctrine of the Churches of England and Scotland of the Calvinists, Huguenots, and others of the name of Protestants or Masons to be damnable, and they themselves to be damned who will not forsake the same. I do further declare that I will help, assist, and advise all or any of His Holiness's agents, in any place where I should be, in Switzerland, Germany, Holland, Ireland or America, or in any other kingdom or territory I shall come to, and do my utmost to extirpate the heretical Protestant or Masonic doctrines and to destroy all their pretended powers, legal or otherwise. I do further promise and declare that, notwithstanding, I am dispensed with to assume any religion heretical for the propagation of the Mother Church's interest; to keep secret and private all her agents' counsels from time to time, as they entrust me, and not to divulge, directly or indirectly, by word, writing or circumstances whatever; but to execute all that should be proposed, given in charge, or discovered unto me by you, my Ghostly Father, or any of this sacred order. I do further promise and declare that I will have no opinion or will of my own or any mental reservation whatever, even as a corpse or cadaver (perinde ac

Exhibit B

cadaver), but will unhesitatingly obey each and every command that I may receive from my superiors in the militia of the Pope and of Jesus Christ. That I will go to any part of the world whithersoever I may be sent, to the frozen regions north, jungles of India, to the centers of civilization of Europe, or to the wild haunts of the barbarous savages of America without murmuring or repining, and will be submissive in all things, whatsoever is communicated to me. I do further promise and declare that I will, when opportunity presents, make and wage relentless war, secretly and openly, against all heretics, Protestants and Masons, as I am directed to do, to extirpate them from the face of the whole earth; and that I will spare neither age, sex nor condition, and that will hang, burn, waste, boil, flay, strangle, and bury alive these infamous heretics; rip up the stomachs and wombs of their women, and crush their infants' heads against the walls in order to annihilate their execrable race. That when the same cannot be done openly I will secretly use the poisonous cup, the strangulation cord, the steel of the poniard, or the leaden bullet, regardless of the honour, rank, dignity or authority of the persons, whatever may be their condition in life, either public or private, as I at any time may be directed so to do by any agents of the Pope or Superior of the Brotherhood of the Holy Father of the Society of Jesus. In confirmation of which I hereby dedicate my life, soul, and all corporal powers, and with the dagger which I now receive I will subscribe my name written in my blood in testimony thereof; and should I prove false, or weaken in my determination, may my brethren and fellow soldiers of the militia of the Pope cut off my hands and feet and my throat from ear to ear, my belly be opened and sulphur burned therein with all the punishment that can be inflicted upon me on earth, and my soul shall be tortured by demons in eternal hell forever. That I will in voting always vote for a Knight of Columbus in preference to a Protestant, especially a Mason, and that I will leave my party so to do; that if two Catholics are on the ticket I will satisfy myself which is the better supporter of Mother Church and vote accordingly. That I will not deal with or employ a Protestant if in my power to deal with or employ a Catholic. That I will place Catholic girls in Protestant families that a weekly report may be made of the inner movements of the heretics. That I will provide myself with arms and ammunition that I may be in readiness when the word is passed, or I am commanded to defend the Church either as an individual or with the militia of the Pope. All of which

I, _____, do swear by the blessed Trinity and blessed sacrament which I am now to receive to perform and on part to keep this my oath. In testimony hereof, I take this most holy and blessed sacrament of the Eucharist and witness the same further with my name written with the point of this dagger dipped in my own blood and seal in the face of this holy sacrament.

UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF
COLUMBIA CIRCUIT

In re Christopher Earl Strunk,

Petitioner for a Writ of Mandamus.

# AFFIDAVIT of
# Eric-Jon: Phelps © in esse

**In support of Christopher-Earl: Strunk© in esse, Petitioner in the
Original Proceeding for a writ of mandamus under FRAP Rule 21 for an
Order of the United States District Court for the District of Columbia to
Recuse the district Judge in 08-cv-2234, 09-cv-1249 09-cv-1295 and
investigation of District Clerk's Office with 28 U.S.C. §455 and related
law in its entirety.**

Christopher-Earl: Strunk © in esse
593 Vanderbilt Avenue #281
Brooklyn, New York 11238
Email: cestrunck@yahoo.com
Cell- (845) 901-6767

EXHIBIT C

**AFFIDAVIT of**
**Eric-Jon: Phelps © in esse**

**In support of Christopher-Earl: Strunk© in esse, Petitioner in the Original Proceeding for a writ of mandamus under FRAP Rule 21 for an Order of the United States District Court for the District of Columbia to Recuse the district Judge in 08-cv-2234, 09-cv-1249 09-cv-1295 and investigation of District Clerk's Office with 28 U.S.C. §455 and related law in its entirety.**


**COMMONWEALTH OF PENNSYLVANIA**   )
                                        )    ss
**COUNTY OF BERKS**                              )


I, Eric-Jon: Phelps© in esse, Affirmant, being duly sworn, depose and state under penalty of perjury:

1. Am a natural born citizen of the Republic of California residing in the Commonwealth of Pennsylvania, am over 18 years of age and not a party to this instant action.

2. Affirmant's residence for service of process is 203 South Fort Zellers Road, Apt. D, Newmanstown, PA, 17073; Email: eric@vaticanassassins.org; home phone : 610-295-5082.

3. Affirmant makes this affidavit in support of Christopher-Earl: Strunk© in esse ("Petitioner"), Petitioner in the Original Proceeding for a writ of mandamus under FRAP Rule 21 for an Order of the United States District Court for the District of Columbia to recuse the District Judge in 08-cv-2234, 09-cv-1249, 09-

2

cv-1295 and investigation of District Clerk's Office with 28 U.S.C. §455 and related law in its entirety.

**4.** That Petitioner has requested that Affirmant testify herein and or related proceedings as an expert witness on the Society of Jesus, also called the Company of Jesus, and related organizations in the following matters:

    **a.** The history of the Bible-based, Protestant Reformation;

    **b.** The history of the Society of Jesus, a.k.a. the Jesuit Order, established by Pope Paul III in 1540;

    **c.** The Jesuit Order's extreme oath of induction swearing complete obedience to the Pope of Rome, which allegiance includes the "extirpation" of all "heretics and liberals" by any means necessary including political assassination;

    **d.** The history of the Jesuit Order's involvement in the western hemisphere, especially as it relates to its *de jure* conversion of "these United States of America" founded in 1787 into a centralized, consolidated Empire in 1868 (via the Fourteenth Amendment to the United States Constitution) until the present;

    **e.** The history of the Bull promulgated by Pope Clement XIV in 1773, suppressing and extinguishing the Jesuit Order "forever;" the Society's resultant war on the papacy through its Illuminati-

controlled Grand Orient and Scottish-Rite Freemasonry leading and directing the French Revolution and subsequent Napoleonic Wars; the Order's restoration in 1814 and subsequent history as to how it presently exercises exclusive control over the Pope of Rome;

f. The grave danger to the very existence of the papacy, the Order having murdered popes, altered Canon Law for its advancement, including directing the Second Vatican Council (1962-1965); the military "Company of Jesus" now serving as the primary impetus behind the international social, religious, political and financial movement for a highly-centralized "New World Order" which, at its consummation, necessitates the destruction of the Vatican and thus the historic Roman Catholic faith;

g. The paramount influence of the Jesuit Order over Washington, D.C., through Georgetown University via its political surrogate, the New York City/Washington, D.C.-based Council on Foreign Relations (CFR) and its offspring, the Trilateral Commission (TC);

h. The secret and yet complete power of the Jesuit Order over a myriad of papal "Court Jews" serving the Company via their membership in the CFR and/or in high-level Freemasonry (Senator Arlen Specter, Senator Charles Schumer, Henry Kissinger,

billionaire George Soros, Obama's White House Chief of Staff Rahm Emanuel, Obama's Senior Advisor David Axelrod, past and present chairmen of the Federal Reserve Board of Governors, Alan Greenspan and Ben Bernanke, etc.);

**i.** The absolute power of the Jesuit Order over the unified Intelligence Community of the American Empire centralized at National Security Agency (NSA) headquarters, Fort Meade, Maryland, it defending the pope's purported power of "binding and loosing;"

**j.** The absolute power of the Jesuit Order over the Central Intelligence Agency since its creation with the National Security Act in 1947, the CIA serving as the Order's enforcement arm over its CFR;

**k.** The absolute power of the Jesuit Order over Pope Benedict XVI's thirteen American Roman Cardinal Archbishops includes the former president of Fordham University, CFR member and Professed Jesuit priest under extreme oath of the fourth vow Joseph A. O'Hare. The immediate foot soldiers of the American Cardinals include Knights of the Sovereign Military Order of Malta (CFR member and President Regan's Secretary of State, Alexander M. Haig, Jr., whose brother, Francis Haig, is a powerful Jesuit priest under extreme oath of the fourth vow; CFR member and President

Reagan's National Security Advisor, Richard V. Allen; etc.); the Knights of St. Gregory (CFR member and Fox News mogul Rupert Murdoch, etc.); the Knights of Columbus (CFR-affiliated House Majority Leader John Boehner, Supreme Court Justice Samuel Alito, etc.) and Opus Dei (CFR-affiliated Supreme Court Justice Antonin Scalia, former Director of the FBI Louis Freeh, convicted American spy for the Russian KGB/SVR, FBI counterintelligence officer Robert Philip Hanssen, etc.);

5. That Affirmant hereby agrees to testify in this or any related other proceeding schedule with reasonable due notice.

6. That Affirmant's area of expertise on the Jesuit Order with references is as follows:

   a. History of the Order including its present Crusade against Islam;

   b. Counter Reformation Doctrines of the Order.

   c. Power of the Order over the late British Empire, American Empire, Russian Empire and Chinese Empire;

   d. Power over the Moslem World and Israel (Rome's revived "Latin Kingdom of Jerusalem") via Freemasonry;

   e. Power over all political leaders worldwide via Illuminized Freemasonry ruling all Supreme Councils of the 33rd Degree;

6

    **f.** Power over the Pope's International Intelligence Community and International Crime Syndicate both conducting the Order's International Drug Trade; International Islamic Masonic Terrorist Network; International Banking Community including all central banks of Europe, the U.S., Canada, Britain, France, etc. through the ubiquitous reach of the NSA, its most secret enclave being "The Jew Room" from which all American Jews are denied access as a matter of National Security;

**7.** That Affirmant was an expert witness for the Plaintiff(s) regarding the Jesuit Order in the California case *Kronzer Foundation v. Caritas of Birmingham* in the Superior Court of San Mateo County, Case No. CLJ 425608. See attached affidavit submitted in that case.

**8.** That Affirmant believes as a factual matter based upon Canon and related law as well as press releases and private periodicals:

    **a.** That the Society of Jesus has re-gained its death grip over the papacy since no later than October, 1836, in which year it secured a papal Brief by which Pope Gregory XVI gave himself and his church over to the diabolical rule of the Order;

    **b.** That the Jesuit Superior General of the Company of Jesus obtained absolute control over every Roman Catholic cardinal, archbishop,

bishop and priest through the decree of papal infallibility issued by the Jesuit-directed and controlled First Vatican Council, 1870, the "Father General" now unfettered in his rule over the Pope's Vatican Empire by commanding the movements of one man;

c. That the Society of Jesus, in order to secure all past privileges granted to the Order prior to its suppression , extorted the Bull *Dolemus inter alia* from Pope Leo XIII in 1880 by first poisoning and then providing the antidote after the Pope signed that Bull further entrenching Jesuit tyranny over the Vatican;

d. That according to the Code of Canon Law, the Pope must have a Jesuit for his immediate confessor, the Jesuit General being fully apprised of all secret designs and counsels of the "Vicar of Christ" and his Roman Curia lest a covert movement to suppress the Society be crowned with success as in the case of Pope Clement XIV's Bull of suppression and extinction of the Society in 1773;

e. That the Society of Jesus "tempers the Chair of St. Peter with assassination," should any Pope disobey clear commands of his Jesuit confessor and advisors as in the case of Pope John Paul I;

f. That in upholding the Pope's universal temporal power in his fanatical quest to rule all nations, the Company of Jesus, exercising

unrivaled control of Pope Pius IX, assassinated President Abraham Lincoln (1865) and with its subsequent assassination of President William McKinley (1901) assumed absolute control of its "Holy Roman" Fourteenth Amendment, cartel-corporate fascist, socialist-communist, American Empire with which to rule the world for the benefit of the Jesuit papacy as Chicago Archbishop James Quigley stated in *The Chicago Tribune* in 1903: "**Within twenty years this country will rule the world. Kings and emperors will soon pass away, and the democracy of the United States will take their place. . . . When the United States rules the world, the Catholic Church will rule the world.**"

**g.** That the Jesuit Order rules the world from America is attested to by Fordham University graduate, G. Gordon Liddy, so stated in his book, *Will: The Autobiography of G. Gordon Liddy*, pp. 23, 36: "**As much as I had admired the German Benedictines, I admired the Jesuits more . . . These men** [*Jesuits at the Fordham University Club*] **ran the world, and they enjoyed it.**"

**h.** That Jesuit priest James Shea, Provincial the Maryland Province of the Society of Jesus, is the overseer of Jesuit Georgetown University president, Knight of Malta/CFR member John DiGioia;

9

he in turn directing the domestic and foreign policy of Prince Hall Rite, 32nd Freemason, Mulatto U.S. President Barry (Davis) Soetoro (alias "Barrack Hussein Obama") through Georgetown University directing Roman Catholic papal knight Vice President Joe Biden, both Sunni Moslem Obama and Roman Catholic Biden being groomed for these positions by Jesuit Temporal Coadjutors for over twenty years, including Roman Catholic U.S. Senator and CFR member Edward M. Kennedy and Roman Catholic ex-National Security Advisor and CFR/TC member Zibignew Bzrezinski;

**i.** That the Jesuit Provincial of the New York Province for the Society of Jesus, David Ciancimino, manages and oversees the centralized wealth and economic power of the American Empire through his control of the Federal Reserve Bank of New York City (which houses over 600,000 gold bricks), JPMorgan Chase, Bank of America, etc., as well as Wall Street, the Stock Market and the Securities and Exchange Commission first headed by Knight of Malta Joseph P. Kennedy, the foremost short-seller of stock in 1929 precipitating the Stock Market Crash and Great Depression;

**j.** That on or about January 10, 1984 President Reagan, by Executive Order, recognized the Vatican as a sovereign political state

exchanging diplomats thereby laying the legal groundwork for the signing of a treaty—a Concordat—with Rome, as did Roman Catholic, Jesuit-advised, Knight of Malta-backed military dictators Adolf Hitler, Benito Mussolini and Francisco Franco;

    **k.** That as a result of said Executive Order issued by President Reagan (having chosen at least six Knights of Malta to conduct his administration), the Society of Jesus is acting in concert serving a foreign sovereign (the Pope of Rome) ruling a sovereign state, (Vatican City)—exclusive of all other considerations—intending to submit the American peoples to a socialist-communist or socialist-fascist military dictator secretly loyal to the "Vicar of Christ;"

**9.** That Georgetown University is within the jurisdiction of the Maryland Province of the Society of Jesus, its Provincial having authority over Delaware, Maryland, Pennsylvania, southern New Jersey, North Carolina, Virginia, West Virginia and Washington, D.C., enveloping government service in the Departments of State, Justice, Homeland Security and other agencies manned by papal knights politically loyal to the Pope of Rome;

**10.** That this ubiquitous Jesuit Power extends to every State capital, to include every State legislature, judiciary and governor in command of his paramilitary state police;

11. That if any governor seeks to seriously resist the occult, political and financial power of the Jesuit Order, he will be removed from office as was Illinois Governor Rod Blagojevich (an Orthodox "heretic" of Serbian descent) who promised that his Illinois State government would refuse to do business with the Jesuit Order's Bank of America headed by then Chairman and now CEO, papal knight Kenneth D. Lewis;

12. That I, the Affirmant, have read the above and know its contents as an expert witness; the facts stated in the Petition are true pursuant to my own personal knowledge, except as to the matters therein stated to be alleged on information and belief. The grounds of Affirmant's beliefs as to all matters not stated upon information and belief are as follows: third parties including a former CIA assassin, classical histories, encyclopedias, rare books, official records, and personal knowledge except as to those stated being logical conclusions premised upon undeniable facts.

Eric-Jon Phelps © in esse

Sworn and so Stated before me this 2ᵘᵒ day of September 2009.

Notary Public

NOTARIAL SEAL
ANN M HASSLER
Notary Public
WOMELSDORF BOROUGH, BERKS COUNTY
My Commission Expires Jan 24, 2013

12

# Vienna Convention on Consular Relations
## 1963

Done at Vienna on 24 April 1963. Entered into force on 19 March 1967.
United Nations, *Treaty Series*, vol. 596, p. 261



Copyright © United Nations
2005

EXHIBIT D

## Vienna Convention on Consular Relations
### Done at Vienna on 24 April 1963

*The States Parties to the present Convention,*

*Recalling* that consular relations have been established between peoples since ancient times,

*Having in mind* the Purposes and Principles of the Charter of the United Nations concerning the sovereign equality of States, the maintenance of international peace and security, and the promotion of friendly relations among nations,

*Considering* that the United Nations Conference on Diplomatic Intercourse and Immunities adopted the Vienna Convention on Diplomatic Relations which was opened for signature on 18 April 1961,

*Believing* that an international convention on consular relations, privileges and immunities would also contribute to the development of friendly relations among nations, irrespective of their differing constitutional and social systems,

*Realizing* that the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States,

*Affirming* that the rules of customary international law continue to govern matters not expressly regulated by the provisions of the present Convention,

*Have agreed* as follows:

### Article 1
#### Definitions

1. For the purposes of the present Convention, the following expressions shall have the meanings hereunder assigned to them:

(*a*)    "consular post" means any consulate-general, consulate, vice-consulate or consular agency;

(*b*)    "consular district" means the area assigned to a consular post for the exercise of consular functions;

(*c*)    "head of consular post" means the person charged with the duty of acting in that capacity;

(*d*)    "consular officer" means any person, including the head of a consular post, entrusted in that capacity with the exercise of consular functions;

(*e*)    "consular employee" means any person employed in the administrative or technical service of a consular post;

(*f*)  "member of the service staff" means any person employed in the domestic service of a consular post;

(*g*)  "members of the consular post" means consular officers, consular employees and members of the service staff;

(*h*)  "members of the consular staff" means consular officers, other than the head of a consular post, consular employees and members of the service staff;

(*i*)  "member of the private staff" means a person who is employed exclusively in the private service of a member of the consular post;

(*j*)  "consular premises" means the buildings or parts of buildings and the land ancillary thereto, irrespective of ownership, used exclusively for the purposes of the consular post;

(*k*)  "consular archives" includes all the papers, documents, correspondence, books, films, tapes and registers of the consular post, together with the ciphers and codes, the card-indexes and any article of furniture intended for their protection or safe keeping.

2. Consular officers are of two categories, namely career consular officers and honorary consular officers. The provisions of Chapter II of the present Convention apply to consular posts headed by career consular officers, the provisions of Chapter III govern consular posts headed by honorary consular officers.

3. The particular status of members of the consular posts who are nationals or permanent residents of the receiving State is governed by article 71 of the present Convention.

## CHAPTER I.
### CONSULAR RELATIONS IN GENERAL
SECTION I.      ESTABLISHMENT AND CONDUCT OF CONSULAR RELATIONS

### *Article 2*
### *Establishment of consular relations*

1. The establishment of consular relations between States takes place by mutual consent

2. The consent given to the establishment of diplomatic relations between two States implies, unless otherwise stated, consent to the establishment of consular relations.

3. The severance of diplomatic relations shall not ipso facto involve the severance of consular relations.

Consular functions are exercised by consular posts. They are also exercised by diplomatic missions in accordance with the provisions of the present Convention.

## Article 4
### Establishment of a consular post

1. A consular post may be established in the territory of the receiving State only with that State's consent

2. The seat of the consular post, its classification and the consular district shall be established by the sending State and shall be subject to the approval of the receiving State.

3. Subsequent changes in the seat of the consular post, its classification or the consular district may be made by the sending State only with the consent of the receiving State.

4. The consent of the receiving State shall also be required if a consulate-general or a consulate desires to open a vice-consulate or a consular agency in a locality other than that in which it is itself established.

5. The prior express consent of the receiving State shall also be required for the opening of an office forming part of an existing consular post elsewhere than at the seat thereof.

## Article 5
### Consular functions

Consular functions consist in:

(a)  protecting in the receiving State the interests of the sending State and of its nationals, both individuals and bodies corporate, within the limits permitted by international law;

(b)  furthering the development of commercial, economic, cultural and scientific relations between the sending State and the receiving State and otherwise promoting friendly relations between them in accordance with the provisions of the present Convention;

(c)  ascertaining by all lawful means conditions and developments in the commercial, economic, cultural and scientific life of the receiving State, reporting thereon to the Government of the sending State and giving information to persons interested;

(d)  issuing passports and travel documents to nationals of the sending State, and visas or appropriate documents to persons wishing to travel to the sending State;

(e)  helping and assisting nationals, both individuals and bodies corporate, of the sending State;

(*f*)    acting as notary and civil registrar and in capacities of a similar kind, and performing certain functions of an administrative nature, provided that there is nothing contrary thereto in the laws and regulations of the receiving State;

(*g*)    safeguarding the interests of nationals, both individuals and bodies corporate, of the sending States in cases of succession *mortis causa* in the territory of the receiving State, in accordance with the laws and regulations of the receiving State;

(*h*)    safeguarding, within the limits imposed by the laws and regulations of the receiving State, the interests of minors and other persons lacking full capacity who are nationals of the sending State, particularly where any guardianship or trusteeship is required with respect to such persons;

(*i*)    subject to the practices and procedures obtaining in the receiving State, representing or arranging appropriate representation for nationals of the sending State before the tribunals and other authorities of the receiving State, for the purpose of obtaining, in accordance with the laws and regulations of the receiving State, provisional measures for the preservation of the rights and interests of these nationals, where, because of absence or any other reason, such nationals are unable at the proper time to assume the defence of their rights and interests;

(*j*)    transmitting judicial and extrajudicial documents or executing letters rogatory or commissions to take evidence for the courts of the sending State in accordance with international agreements in force or, in the absence of such international agreements, in any other manner compatible with the laws and regulations of the receiving State;

(*k*)    exercising rights of supervision and inspection provided for in the laws and regulations of the sending State in respect of vessels having the nationality of the sending State, and of aircraft registered in that State, and in respect of their crews;

(*l*)    extending assistance to vessels and aircraft mentioned in subparagraph (*k*) of this article, and to their crews, taking statements regarding the voyage of a vessel, examining and stamping the ship's papers, and, without prejudice to the powers of the authorities of the receiving State, conducting investigations into any incidents which occurred during the voyage, and settling disputes of any kind between the master, the officers and the seamen insofar as this may be authorized by the laws and regulations of the sending State;

(*m*)    performing any other functions entrusted to a consular post by the sending State which are not prohibited by the laws and regulations of the receiving State or to which no objection is taken by the receiving State or which are referred to in the international agreements in force between the sending State and the receiving State.

### Article 6
#### *Exercise of consular functions outside the consular district*

A consular officer may, in special circumstances, with the consent of the receiving State, exercise his functions outside his consular district.

### Article 7
*Exercise of consular functions in a third State*

The sending State may, after notifying the States concerned, entrust a consular post established in a particular State with the exercise of consular functions in another State, unless there is express objection by one of the States concerned

### Article 8
*Exercise of consular functions on behalf of a third State*

Upon appropriate notification to the receiving State, a consular post of the sending State may, unless the receiving State objects, exercise consular functions in the receiving State on behalf of a third State.

### Article 9
*Classes of heads of consular posts*

1 Heads of consular posts are divided into four classes, namely

(*a*)  consuls-general;

(*b*)  consuls;

(*c*)  vice-consuls;

(*d*)  consular agents

2. Paragraph 1 of this article in no way restricts the right of any of the Contracting Parties to fix the designation of consular officers other than the heads of consular posts.

### Article 10
*Appointment and admission of heads of consular posts*

1. Heads of consular posts are appointed by the sending State and are admitted to the exercise of their functions by the receiving State.

2. Subject to the provisions of the present Convention, the formalities for the appointment and for the admission of the head of a consular post are determined by the laws, regulations and usages of the sending State and of the receiving State respectively.

### Article 11
*The consular commission or notification of appointment*

1. The head of a consular post shall be provided by the sending State with a document, in the form of a commission or similar instrument, made out for each appointment, certifying his capacity and

showing, as a general rule, his full name, his category and class, the consular district and the seat of the consular post.

2. The sending State shall transmit the commission or similar instrument through the diplomatic or other appropriate channel to the Government of the State in whose territory the head of a consular post is to exercise his functions.

3. If the receiving State agrees, the sending State may, instead of a commission or similar instrument, send to the receiving State a notification containing the particulars required by paragraph 1 of this article.

### Article 12
#### The exequatur

1. The head of a consular post is admitted to the exercise of his functions by an authorization from the receiving State termed an *exequatur*, whatever the form of this authorization.

2. A State which refused to grant an *exequatur* is not obliged to give to the sending State reasons for such refusal.

3. Subject to the provisions of articles 13 and 15, the head of a consular post shall not enter upon his duties until he has received an *exequatur*.

### Article 13
#### Provisional admission of heads of consular posts

Pending delivery of the *exequatur*, the head of a consular post may be admitted on a provisional basis to the exercise of his functions. In that case, the provisions of the present Convention shall apply.

### Article 14
#### Notification to the authorities of the consular district

As soon as the head of a consular post is admitted even provisionally to the exercise of his functions, the receiving State shall immediately notify the competent authorities of the consular district. It shall also ensure that the necessary measures are taken to enable the head of a consular post to carry out the duties of his office and to have the benefit of the provisions of the present Convention.

### Article 15
#### Temporary exercise of the functions of the
#### head of a consular post

1. If the head of a consular post is unable to carry out his functions or the position of head of consular post is vacant, an acting head of post may act provisionally as head of the consular post

2 The full name of the acting head of post shall be notified either by the diplomatic mission of the sending State or, if that State has no such mission in the receiving State, by the head of the consular

post. or. if he is unable to do so, by any competent authority of the sending State, to the Ministry for Foreign Affairs of the receiving State or to the authority designated by that Ministry. As a general rule, this notification shall be given in advance. The receiving State may make the admission as acting head of post of a person who is neither a diplomatic agent nor a consular officer of the sending State in the receiving State conditional on its consent.

3 The competent authorities of the receiving State shall afford assistance and protection to the acting head of post. While he is in charge of the post, the provisions of the present Convention shall apply to him on the same basis as to the head of the consular post concerned. The receiving State shall not, however, be obliged to grant to an acting head of post any facility, privilege or immunity which the head of the consular post enjoys only subject to conditions not fulfilled by the acting head of post.

4. When, in the circumstances referred to in paragraph 1 of this article, a member of the diplomatic staff of the diplomatic mission of the sending State in the receiving State is designated by the sending State as an acting head of post, he shall, if the receiving State does not object thereto, continue to enjoy diplomatic privileges and immunities.

### Article 16
#### Precedence as between heads of consular posts

1. Heads of consular posts shall rank in each class according to the date of the grant of the *exequatur*.

2. If, however, the head of a consular post before obtaining the *exequatur* is admitted to the exercise of his functions provisionally, his precedence shall be determined according to the date of the provisional admission; this precedence shall be maintained after the granting of the *exequatur*.

3. The order of precedence as between two or more heads of consular posts who obtained the *exequatur* or provisional admission on the same date shall be determined according to the dates on which their commissions or similar instruments or the notifications referred to in paragraph 3 of article 11 were presented to the receiving State.

4. Acting heads of posts shall rank after all heads of consular posts and, as between themselves, they shall rank according to the dates on which they assumed their functions as acting heads of posts as indicated in the notifications given under paragraph 2 of article 15.

5. Honorary consular officers who are heads of consular posts shall rank in each class after career heads of consular posts, in the order and according to the rules laid down in the foregoing paragraphs.

6. Heads of consular posts shall have precedence over consular officers not having that status.

### Article 17
#### Performance of diplomatic acts by consular officers

1 In a State where the sending State has no diplomatic mission and is not represented by a diplomatic mission of a third State, a consular officer may, with the consent of the receiving State, and

without affecting his consular status, be authorized to perform diplomatic acts. The performance of such acts by a consular officer shall not confer upon him any right to claim diplomatic privileges and immunities.

2 A consular officer may, after notification addressed to the receiving State, act as representative of the sending State to any intergovernmental organization. When so acting, he shall be entitled to enjoy any privileges and immunities accorded to such a representative by customary international law or by international agreements; however, in respect of the performance by him of any consular function, he shall not be entitled to any greater immunity from jurisdiction than that to which a consular officer is entitled under the present Convention.

### Article 18
#### Appointment of the same person by two or more States as a consular officer

Two or more States may, with the consent of the receiving State, appoint the same person as a consular officer in that State.

### Article 19
#### Appointment of members of consular staff

1 Subject to the provisions of articles 20, 22 and 23, the sending State may freely appoint the members of the consular staff

2. The full name, category and class of all consular officers, other than the head of a consular post, shall be notified by the sending State to the receiving State in sufficient time for the receiving State, if it so wishes, to exercise its rights under paragraph 3 of article 23.

3. The sending State may, if required by its laws and regulations, request the receiving State to grant an *exequatur* to a consular officer other than the head of a consular post.

4. The receiving State may, if required by its laws and regulations, grant an *exequatur* to a consular officer other than the head of a consular post.

### Article 20
#### Size of the consular staff

In the absence of an express agreement as to the size of the consular staff, the receiving State may require that the size of the staff be kept within limits considered by it to be reasonable and normal, having regard to circumstances and conditions in the consular district and to the needs of the particular consular post.

## Article 21
### Precedence as between consular officers of a consular post

The order of precedence as between the consular officers of a consular post and any change thereof shall be notified by the diplomatic mission of the sending State or, if that State has no such mission in the receiving State, by the head of the consular post, to the Ministry for Foreign Affairs of the receiving State or to the authority designated by that Ministry.

## Article 22
### Nationality of consular officers

1. Consular officers should, in principle, have the nationality of the sending State.

2. Consular officers may not be appointed from among persons having the nationality of the receiving State except with the express consent of that State which may be withdrawn at any time.

3. The receiving State may reserve the same right with regard to nationals of a third State who are not also nationals of the sending State.

## Article 23
### Persons declared "non grata"

1 The receiving State may at any time notify the sending State that a consular officer is persona non grata or that any other member of the consular staff is not acceptable. In that event, the sending State shall, as the case may be, either recall the person concerned or terminate his functions with the consular post.

2. If the sending State refuses or fails within a reasonable time to carry out its obligations under paragraph 1 of this article, the receiving State may, as the case may be, either withdraw the *exequatur* from the person concerned or cease to consider him as a member of the consular staff.

3. A person appointed as a member of a consular post may be declared unacceptable before arriving in the territory of the receiving State or, if already in the receiving State, before entering on his duties with the consular post. In any such case, the sending State shall withdraw his appointment.

4. In the cases mentioned in paragraphs 1 and 3 of this article, the receiving State is not obliged to give to the sending State reasons for its decision.

## Article 24
### Notification to the receiving State of appointments, arrivals and departures

1 The Ministry for Foreign Affairs of the receiving State or the authority designated by that Ministry shall be notified of:

(a)   the appointment of members of a consular post, their arrival after appointment to the consular post, their final departure or the termination of their functions and any other changes affecting their status that may occur in the course of their service with the consular post;

(b)   the arrival and final departure of a person belonging to the family of a member of a consular post forming part of his household and, where appropriate, the fact that a person becomes or ceases to be such a member of the family;

(c)   the arrival and final departure of members of the private staff and, where appropriate, the termination of their service as such;

(d)   the engagement and discharge of persons resident in the receiving State as members of a consular post or as members of the private staff entitled to privileges and immunities.

2. When possible, prior notification of arrival and final departure shall also be given.

## SECTION II.
### END OF CONSULAR FUNCTIONS

### Article 25
#### Termination of the functions of a member of a consular post

The functions of a member of a consular post shall come to an end, inter alia:

(a)   on notification by the sending State to the receiving State that his functions have come to an end;

(b)   on withdrawal of the *exequatur*;

(c)   on notification by the receiving State to the sending State that the receiving State has ceased to consider him as a member of the consular staff.

### Article 26
#### Departure from the territory of the receiving State

The receiving State shall, even in case of armed conflict, grant to members of the consular post and members of the private staff, other than nationals of the receiving State, and to members of their families forming part of their households irrespective of nationality, the necessary time and facilities to enable them to prepare their departure and to leave at the earliest possible moment after the termination of the functions of the members concerned. In particular, it shall, in case of need, place at their disposal the necessary means of transport for themselves and their property other than property acquired in the receiving State the export of which is prohibited at the time of departure.

*Article 27*
*Protection of consular premises and archives and of the
interests of the sending State in exceptional circumstances*

1. In the event of the severance of consular relations between two States:

(a)     the receiving State shall, even in case of armed conflict, respect and protect the consular premises, together with the property of the consular post and the consular archives;

(b)     the sending State may entrust the custody of the consular premises, together with the property contained therein and the consular archives, to a third State acceptable to the receiving State;

(c)     the sending State may entrust the protection of its interests and those of its nationals to a third State acceptable to the receiving State.

2. In the event of the temporary or permanent closure of a consular post, the provisions of subparagraph (a) of paragraph 1 of this article shall apply. In addition,

(a)     if the sending State, although not represented in the receiving State by a diplomatic mission, has another consular post in the territory of that State, that consular post may be entrusted with the custody of the premises of the consular post which has been closed, together with the property contained therein and the consular archives, and, with the consent of the receiving State, with the exercise of consular functions in the district of that consular post; or

(b)     if the sending State has no diplomatic mission and no other consular post in the receiving State, the provisions of subparagraphs (b) and (c) of paragraph 1 of this article shall apply.

CHAPTER II.

FACILITIES, PRIVILEGES AND IMMUNITIES
RELATING TO CONSULAR POSTS, CAREER CONSULAR
OFFICERS AND OTHER MEMBERS OF A CONSULAR POST

SECTION I. FACILITIES, PRIVILEGES AND IMMUNITIES RELATING
TO A CONSULAR POST

*Article 28*
*Facilities for the work of the consular post*

The receiving State shall accord full facilities for the performance of the functions of the consular post.

*Article 29*
*Use of national flag and coat-of-arms*

1. The sending State shall have the right to the use of its national flag and coat-of-arms in the receiving State in accordance with the provisions of this article.

2. The national flag of the sending State may be flown and its coat-of-arms displayed on the building occupied by the consular post and at the entrance door thereof, on the residence of the head of the consular post and on his means of transport when used on official business.

3. In the exercise of the right accorded by this article regard shall be had to the laws, regulations and usages of the receiving State.

### Article 30
#### Accommodation

1. The receiving State shall either facilitate the acquisition on its territory, in accordance with its laws and regulations, by the sending State of premises necessary for its consular post or assist the latter in obtaining accommodation in some other way

2. It shall also, where necessary, assist the consular post in obtaining suitable accommodation for its members.

### Article 31
#### Inviolability of the consular premises

1. Consular premises shall be inviolable to the extent provided in this article.

2 The authorities of the receiving State shall not enter that part of the consular premises which is used exclusively for the purpose of the work of the consular post except with the consent of the head of the consular post or of his designee or of the head of the diplomatic mission of the sending State. The consent of the head of the consular post may, however, be assumed in case of fire or other disaster requiring prompt protective action.

3. Subject to the provisions of paragraph 2 of this article, the receiving State is under a special duty to take all appropriate steps to protect the consular premises against any intrusion or damage and to prevent any disturbance of the peace of the consular post or impairment of its dignity.

4. The consular premises, their furnishings, the property of the consular post and its means of transport shall be immune from any form of requisition for purposes of national defence or public utility. If expropriation is necessary for such purposes, all possible steps shall be taken to avoid impeding the performance of consular functions, and prompt, adequate and effective compensation shall be paid to the sending State.

### Article 32
#### Exemption from taxation of consular premises

1. Consular premises and the residence of the career head of consular post of which the sending State or any person acting on its behalf is the owner or lessee shall be exempt from all national, regional or municipal dues and taxes whatsoever, other than such as represent payment for specific services rendered.

2. The exemption from taxation referred to paragraph 1 of this article shall not apply to such dues and taxes if, under the law of the receiving State, they are payable by the person who contracted with the sending State or with the person acting on its behalf

### Article 33
### *Inviolability of the consular archives and documents*

The consular archives and documents shall be inviolable at all times and wherever they may be

### Article 34
### *Freedom of movement*

Subject to its laws and regulations concerning zones entry into which is prohibited or regulated for reasons of national security, the receiving State shall ensure freedom of movement and travel in its territory to all members of the consular post.

### Article 35
### *Freedom of communication*

1 The receiving State shall permit and protect freedom of communication on the part of the consular post for all official purposes. In communicating with the Government, the diplomatic missions and other consular posts, wherever situated, of the sending State, the consular post may employ all appropriate means, including diplomatic or consular couriers, diplomatic or consular bags and messages in code or cipher. However, the consular post may install and use a wireless transmitter only with the consent of the receiving State.

2. The official correspondence of the consular post shall be inviolable. Official correspondence means all correspondence relating to the consular post and its functions.

3. The consular bag shall be neither opened nor detained. Nevertheless, if the competent authorities of the receiving State have serious reason to believe that the bag contains something other than the correspondence, documents or articles referred to in paragraph 4 of this article, they may request that the bag be opened in their presence by an authorized representative of the sending State. If this request is refused by the authorities of the sending State, the bag shall be returned to its place of origin.

4. The packages constituting the consular bag shall bear visible external marks of their character and may contain only official correspondence and documents or articles intended exclusively for official use.

5 The consular courier shall be provided with an official document indicating his status and the number of packages constituting the consular bag. Except with the consent of the receiving State he shall be neither a national of the receiving State, nor, unless he is a national of the sending State, a permanent resident of the receiving State. In the performance of his functions he shall be protected by the receiving State. He shall enjoy personal inviolability and shall not be liable to any form of arrest or detention

6 The sending State, its diplomatic missions and its consular posts may designate consular couriers ad hoc. In such cases the provisions of paragraph 5 of this article shall also apply except that the immunities therein mentioned shall cease to apply when such a courier has delivered to the consignee the consular bag in his charge.

7 A consular bag may be entrusted to the captain of a ship or of a commercial aircraft scheduled to land at an authorized port of entry. He shall be provided with an official document indicating the number of packages constituting the bag, but he shall not be considered to be a consular courier. By arrangement with the appropriate local authorities, the consular post may send one of its members to take possession of the bag directly and freely from the captain of the ship or of the aircraft.

*Article 36*
*Communication and contact with nationals*
*of the sending State*

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

*(a)* consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;

*(b)* if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this subparagraph;

*(c)* consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgement. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2. The rights referred to in paragraph 1 of this article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this article are intended.

*Article 37*
*Information in cases of deaths, guardianship or trusteeship,
wrecks and air accidents*

If the relevant information is available to the competent authorities of the receiving State, such authorities shall have the duty:

(a)    in the case of the death of a national of the sending State, to inform without delay the consular post in whose district the death occurred;

(b)    to inform the competent consular post without delay of any case where the appointment of a guardian or trustee appears to be in the interests of a minor or other person lacking full capacity who is a national of the sending State. The giving of this information shall, however, be without prejudice to the operation of the laws and regulations of the receiving State concerning such appointments;

(c)    if a vessel, having the nationality of the sending State, is wrecked or runs aground in the territorial sea or internal waters of the receiving State, or if an aircraft registered in the sending State suffers an accident on the territory of the receiving State, to inform without delay the consular post nearest to the scene of the occurrence

### Article 38
*Communication with the authorities of the receiving State*

In the exercise of their functions, consular officers may address:

(a)    the competent local authorities of their consular district;

(b)    the competent central authorities of the receiving State if and to the extent that this is allowed by the laws, regulations and usages of the receiving State or by the relevant international agreements.

### Article 39
*Consular fees and charges*

1. The consular post may levy in the territory of the receiving State the fees and charges provided by the laws and regulations of the sending State for consular acts.

2. The sums collected in the form of the fees and charges referred to in paragraph 1 of this article, and the receipts for such fees and charges, shall be exempt from all dues and taxes in the receiving State

### Article 40
### *Protection of consular officers*

The receiving State shall treat consular officers with due respect and shall take all appropriate steps to prevent any attack on their person, freedom or dignity.

### Article 41
### *Personal inviolability of consular officers*

1 Consular officers shall not be liable to arrest or detention pending trial, except in the case of a grave crime and pursuant to a decision by the competent judicial authority

2. Except in the case specified in paragraph 1 of this article, consular officers shall not be committed to prison or be liable to any other form of restriction on their personal freedom save in execution of a judicial decision of final effect.

3 If criminal proceedings are instituted against a consular officer, he must appear before the competent authorities. Nevertheless, the proceedings shall be conducted with the respect due to him by reason of his official position and, except in the case specified in paragraph 1 of this article, in a manner which will hamper the exercise of consular functions as little as possible. When, in the circumstances mentioned in paragraph 1 of this article, it has become necessary to detain a consular officer, the proceedings against him shall be instituted with the minimum of delay.

### Article 42
### *Notification of arrest, detention or prosecution*

In the event of the arrest or detention, pending trial, of a member of the consular staff, or of criminal proceedings being instituted against him, the receiving State shall promptly notify the head of the consular post. Should the latter be himself the object of any such measure, the receiving State shall notify the sending State through the diplomatic channel.

### Article 43
### *Immunity from jurisdiction*

1. Consular officers and consular employees shall not be amenable to the jurisdiction of the judicial or administrative authorities of the receiving State in respect of acts performed in the exercise of consular functions



2. The provisions of paragraph 1 of this article shall not, however, apply in respect of a civil action either:



(*a*)   arising out of a contract concluded by a consular officer or a consular employee in which he did not contract expressly or impliedly as an agent of the sending State; or

(*b*)   by a third party for damage arising from an accident in the receiving State caused by a vehicle, vessel or aircraft.

### Article 44
### Liability to give evidence

1. Members of a consular post may be called upon to attend as witnesses in the course of judicial or administrative proceedings. A consular employee or a member of the service staff shall not, except in the cases mentioned in paragraph 3 of this article, decline to give evidence. If a consular officer should decline to do so, no coercive measure or penalty may be applied to him.

2. The authority requiring the evidence of a consular officer shall avoid interference with the performance of his functions. It may, when possible, take such evidence at his residence or at the consular post or accept a statement from him in writing.

3. Members of a consular post are under no obligation to give evidence concerning matters connected with the exercise of their functions or to produce official correspondence and documents relating thereto. They are also entitled to decline to give evidence as expert witnesses with regard to the law of the sending State.

### Article 45
### Waiver of privileges and immunities

1. The sending State may waive, with regard to a member of the consular post, any of the privileges and immunities provided for in articles 41, 43 and 44.

2. The waiver shall in all cases be express, except as provided in paragraph 3 of this article, and shall be communicated to the receiving State in writing.

3. The initiation of proceedings by a consular officer or a consular employee in a matter where he might enjoy immunity from jurisdiction under article 43 shall preclude him from invoking immunity from jurisdiction in respect of any counterclaim directly connected with the principal claim.

4. The waiver of immunity from jurisdiction for the purposes of civil or administrative proceedings shall not be deemed to imply the waiver of immunity from the measures of execution resulting from the judicial decision; in respect of such measures, a separate waiver shall be necessary.

1 Consular officers and consular employees and members of their families forming part of their households shall be exempt from all obligations under the laws and regulations of the receiving State in regard to the registration of aliens and residence permits

2 The provisions of paragraph 1 of this article shall not, however, apply to any consular employee who is not a permanent employee of the sending State or who carries on any private gainful occupation in the receiving State or to any member of the family of any such employee.

## Article 47
### Exemption from work permits

1 Members of the consular post shall, with respect to services rendered for the sending State, be exempt from any obligations in regard to work permits imposed by the laws and regulations of the receiving State concerning the employment of foreign labour.

2. Members of the private staff of consular officers and of consular employees shall, if they do not carry on any other gainful occupation in the receiving State, be exempt from the obligations referred to in paragraph 1 of this article.

## Article 48
### Social security exemption

1. Subject to the provisions of paragraph 3 of this article, members of the consular post with respect to services rendered by them for the sending State, and members of their families forming part of their households, shall be exempt from social security provisions which may be in force in the receiving State.

2. The exemption provided for in paragraph 1 of this article shall apply also to members of the private staff who are in the sole employ of members of the consular post, on condition:

(*a*)    that they are not nationals of or permanently resident in the receiving State; and

(*b*)    that they are covered by the social security provisions which are in force in the sending State or a third State.

3. Members of the consular post who employ persons to whom the exemption provided for in paragraph 2 of this article does not apply shall observe the obligations which the social security provisions of the receiving State impose upon employers.

4 The exemption provided for in paragraphs 1 and 2 of this article shall not preclude voluntary participation in the social security system of the receiving State, provided that such participation is permitted by that State.

## Article 49
### Exemption from taxation

1. Consular officers and consular employees and members of their families forming part of their households shall be exempt from all dues and taxes, personal or real, national, regional or municipal, except:

(a) indirect taxes of a kind which are normally incorporated in the price of goods or services;

(b) dues or taxes on private immovable property situated in the territory of the receiving State, subject to the provisions of article 32;

(c) estate, succession or inheritance duties, and duties on transfers, levied by the receiving State, subject to the provisions of paragraph (b) of article 51;

(d) dues and taxes on private income, including capital gains, having its source in the receiving State and capital taxes relating to investments made in commercial or financial undertakings in the receiving State;

(e) charges levied for specific services rendered;

(f) registration, court or record fees, mortgage dues and stamp duties, subject to the provisions of article 32.

2. Members of the service staff shall be exempt from dues and taxes on the wages which they receive for their services.

3. Members of the consular post who employ persons whose wages or salaries are not exempt from income tax in the receiving State shall observe the obligations which the laws and regulations of that State impose upon employers concerning the levying of income tax.

## Article 50
### Exemption from customs duties and inspection

1. The receiving State shall, in accordance with such laws and regulations as it may adopt, permit entry of and grant exemption from all customs duties, taxes, and related charges other than charges for storage, cartage and similar services, on:

(a) articles for the official use of the consular post;

(b) articles for the personal use of a consular officer or members of his family forming part of his household, including articles intended for his establishment. The articles intended for consumption shall not exceed the quantities necessary for direct utilization by the persons concerned.

2. Consular employees shall enjoy the privileges and exemptions specified in paragraph 1 of this article in respect of articles imported at the time of first installation.

3. Personal baggage accompanying consular officers and members of their families forming part of their households shall be exempt from inspection. It may be inspected only if there is serious reason to believe that it contains articles other than those referred to in subparagraph (b) of paragraph 1 of this article, or articles the import or export of which is prohibited by the laws and regulations of the receiving State or which are subject to its quarantine laws and regulations. Such inspection shall be carried out in the presence of the consular officer or member of his family concerned.

*Article 51*
*Estate of a member of the consular post*
*or of a member of his family*

In the event of the death of a member of the consular post or of a member of his family forming part of his household, the receiving State:

(a)    shall permit the export of the movable property of the deceased, with the exception of any such property acquired in the receiving State the export of which was prohibited at the time of his death;

(b)    shall not levy national, regional or municipal estate, succession or inheritance duties, and duties on transfers, on movable property the presence of which in the receiving State was due solely to the presence in that State of the deceased as a member of the consular post or as a member of the family of a member of the consular post.

*Article 52*
*Exemption from personal services and contributions*

The receiving State shall exempt members of the consular post and members of their families forming part of their households from all personal services, from all public service of any kind whatsoever, and from military obligations such as those connected with requisitioning, military contributions and billeting.

*Article 53*
*Beginning and end of consular privileges and immunities*

1 Every member of the consular post shall enjoy the privileges and immunities provided in the present Convention from the moment he enters the territory of the receiving State on proceeding to take up his post or, if already in its territory, from the moment when he enters on his duties with the consular post

2. Members of the family of a member of the consular post forming part of his household and members of his private staff shall receive the privileges and immunities provided in the present Convention from the date from which he enjoys privileges and immunities in accordance with paragraph 1 of this article or from the date of their entry into the territory of the receiving State or from the date of their becoming a member of such family or private staff, whichever is the latest.

3. When the functions of a member of the consular post have come to an end, his privileges and immunities and those of a member of his family forming part of his household or a member of his

private staff shall normally cease at the moment when the person concerned leaves the receiving State or on the expiry of a reasonable period in which to do so, whichever is the sooner, but shall subsist until that time, even in case of armed conflict. In the case of the persons referred to in paragraph 2 of this article, their privileges and immunities shall come to an end when they cease to belong to the household or to be in the service of a member of the consular post provided, however, that if such persons intend leaving the receiving State within a reasonable period thereafter, their privileges and immunities shall subsist until the time of their departure.

4. However, with respect to acts performed by a consular officer or a consular employee in the exercise of his functions, immunity from jurisdiction shall continue to subsist without limitation of time.

5. In the event of the death of a member of the consular post, the members of his family forming part of his household shall continue to enjoy the privileges and immunities accorded to them until they leave the receiving State or until the expiry of a reasonable period enabling them to do so, whichever is the sooner.

*Article 54*
*Obligations of third States*

1. If a consular officer passes through or is in the territory of a third State, which has granted him a visa if a visa was necessary, while proceeding to take up or return to his post or when returning to the sending State, the third State shall accord to him all immunities provided for by the other articles of the present Convention as may be required to ensure his transit or return. The same shall apply in the case of any member of his family forming part of his household enjoying such privileges and immunities who are accompanying the consular officer or travelling separately to join him or to return to the sending State.

2. In circumstances similar to those specified in paragraph 1 of this article, third States shall not hinder the transit through their territory of other members of the consular post or of members of their families forming part of their households.

3. Third States shall accord to official correspondence and to other official communications in transit, including messages in code or cipher, the same freedom and protection as the receiving State is bound to accord under the present Convention. They shall accord to consular couriers who have been granted a visa, if a visa was necessary, and to consular bags in transit, the same inviolability and protection as the receiving State is bound to accord under the present Convention.

4. The obligations of third States under paragraphs 1, 2 and 3 of this article shall also apply to the persons mentioned respectively in those paragraphs, and to official communications and to consular bags, whose presence in the territory of the third State is due to force majeure.

## Article 55
### *Respect for the laws and regulations of the receiving State*

1 Without prejudice to their privileges and immunities, it is the duty of all persons enjoying such privileges and immunities to respect the laws and regulations of the receiving State. They also have a duty not to interfere in the internal affairs of the State.

2 The consular premises shall not be used in any manner incompatible with the exercise of consular functions.

3 The provisions of paragraph 2 of this article shall not exclude the possibility of offices of other institutions or agencies being installed in part of the building in which the consular premises are situated, provided that the premises assigned to them are separate from those used by the consular post In that event, the said offices shall not, for the purposes of the present Convention, be considered to form part of the consular premises.

## Article 56
### *Insurance against third party risks*

Members of the consular post shall comply with any requirements imposed by the laws and regulations of the receiving State, in respect of insurance against third party risks arising from the use of any vehicle, vessel or aircraft.

## Article 57
### *Special provisions concerning private gainful occupation*

1 Career consular officers shall not carry on for personal profit any professional or commercial activity in the receiving State.

2. Privileges and immunities provided in this chapter shall not be accorded:

(*a*)    to consular employees or to members of the service staff who carry on any private gainful occupation in the receiving State;

(*b*)    to members of the family of a person referred to in subparagraph (*a*) of this paragraph or to members of his private staff;

(c)    to members of the family of a member of a consular post who themselves carry on any private gainful occupation in the receiving State.

### Article 58
*General provisions relating to facilities, privileges
and immunities*

1. Articles 28, 29, 30, 34, 35, 36, 37, 38 and 39, paragraph 3 of article 54 and paragraphs 2 and 3 of article 55 shall apply to consular posts headed by an honorary consular officer. In addition, the facilities, privileges and immunities of such consular posts shall be governed by articles 59, 60, 61 and 62

2. Articles 42 and 43, paragraph 3 of article 44, articles 45 and 53 and paragraph 1 of article 55 shall apply to honorary consular officers. In addition, the facilities, privileges and immunities of such consular officers shall be governed by articles 63, 64, 65, 66 and 67.

3. Privileges and immunities provided in the present Convention shall not be accorded to members of the family of an honorary consular officer or of a consular employee employed at a consular post headed by an honorary consular officer.

4 The exchange of consular bags between two consular posts headed by honorary consular officers in different States shall not be allowed without the consent of the two receiving States concerned.

### Article 59
*Protection of the consular premises*

The receiving State shall take such steps as may be necessary to protect the consular premises of a consular post headed by an honorary consular officer against any intrusion or damage and to prevent any disturbance of the peace of the consular post or impairment of its dignity.

### Article 60
*Exemption from taxation of consular premises*

1. Consular premises of a consular post headed by an honorary consular officer of which the sending State is the owner or lessee shall be exempt from all national, regional or municipal dues and taxes whatsoever, other than such as represent payment for specific services rendered.

2. The exemption from taxation referred to in paragraph 1 of this article shall not apply to such dues and taxes if, under the laws and regulations of the receiving State, they are payable by the person who contracted with the sending State.

## Article 61
### Inviolability of consular archives and documents

The consular archives and documents of a consular post headed by an honorary consular officer shall be inviolable at all times and wherever they may be, provided that they are kept separate from other papers and documents and, in particular, from the private correspondence of the head of a consular post and of any person working with him, and from the materials, books or documents relating to their profession or trade.

## Article 62
### Exemption from customs duties

The receiving State shall, in accordance with such laws and regulations as it may adopt, permit entry of, and grant exemption from all customs duties, taxes, and related charges other than charges for storage, cartage and similar services on the following articles, provided that they are for the official use of a consular post headed by an honorary consular officer: coats-of-arms, flags, signboards, seals and stamps, books, official printed matter, office furniture, office equipment and similar articles supplied by or at the instance of the sending State to the consular post.

## Article 63
### Criminal proceedings

If criminal proceedings are instituted against an honorary consular officer, he must appear before the competent authorities. Nevertheless, the proceedings shall be conducted with the respect due to him by reason of his official position and, except when he is under arrest or detention, in a manner which will hamper the exercise of consular functions as little as possible. When it has become necessary to detain an honorary consular officer, the proceedings against him shall be instituted with the minimum of delay.

## Article 64
### Protection of honorary consular officers

The receiving State is under a duty to accord to an honorary consular officer such protection as may be required by reason of his official position.

## Article 65
### Exemption from registration of aliens and residence permits

Honorary consular officers, with the exception of those who carry on for personal profit any professional or commercial activity in the receiving State, shall be exempt from all obligations under the laws and regulations of the receiving State in regard to the registration of aliens and residence permits.

An honorary consular officer shall be exempt from all dues and taxes on the remuneration and emoluments which he receives from the sending State in respect of the exercise of consular functions.

*Article 67*
*Exemption from personal services and contributions*

The receiving State shall exempt honorary consular officers from all personal services and from all public services of any kind whatsoever and from military obligations such as those connected with requisitioning, military contributions and billeting.

*Article 68*
*Optional character of the institution of*
*honorary consular officers*

Each State is free to decide whether it will appoint or receive honorary consular officers

CHAPTER IV.
GENERAL PROVISIONS

*Article 69*
*Consular agents who are not heads of consular posts*

1. Each State is free to decide whether it will establish or admit consular agencies conducted by consular agents not designated as heads of consular post by the sending State.

2. The conditions under which the consular agencies referred to in paragraph 1 of this article may carry on their activities and the privileges and immunities which may be enjoyed by the consular agents in charge of them shall be determined by agreement between the sending State and the receiving State

*Article 70*
*Exercise of consular functions by diplomatic missions*

1. The provisions of the present Convention apply also, so far as the context permits, to the exercise of consular functions by a diplomatic mission.

2. The names of members of a diplomatic mission assigned to the consular section or otherwise charged with the exercise of the consular functions of the mission shall be notified to the Ministry for Foreign Affairs of the receiving State or to the authority designated by that Ministry.

3. In the exercise of consular functions a diplomatic mission may address:

(*a*)    the local authorities of the consular district;

(*b*)    the central authorities of the receiving State if this is allowed by the laws, regulations and usages of the receiving State or by relevant international agreements

4 The privileges and immunities of the members of a diplomatic mission referred to in paragraph 2 of this article shall continue to be governed by the rules of international law concerning diplomatic relations.

## Article 71
### Nationals or permanent residents of the receiving State

1. Except insofar as additional facilities, privileges and immunities may be granted by the receiving State, consular officers who are nationals of or permanently resident in the receiving State shall enjoy only immunity from jurisdiction and personal inviolability in respect of official acts performed in the exercise of their functions, and the privileges provided in paragraph 3 of article 44. So far as these consular officers are concerned, the receiving State shall likewise be bound by the obligation laid down in article 42. If criminal proceedings are instituted against such a consular officer, the proceedings shall, except when he is under arrest or detention, be conducted in a manner which will hamper the exercise of consular functions as little as possible.

2. Other members of the consular post who are nationals of or permanently resident in the receiving State and members of their families, as well as members of the families of consular officers referred to in paragraph 1 of this article, shall enjoy facilities, privileges and immunities only insofar as these are granted to them by the receiving State. Those members of the families of members of the consular post and those members of the private staff who are themselves nationals of or permanently resident in the receiving State shall likewise enjoy facilities, privileges and immunities only insofar as these are granted to them by the receiving State. The receiving State shall, however, exercise its jurisdiction over those persons in such a way as not to hinder unduly the performance of the functions of the consular post.

## Article 72
### Non-discrimination

1. In the application of the provisions of the present Convention the receiving State shall not discriminate as between States.

2. However, discrimination shall not be regarded as taking place:

(*a*)    where the receiving State applies any of the provisions of the present Convention restrictively because of a restrictive application of that provision to its consular posts in the sending State;

(*b*)    where by custom or agreement States extend to each other more favourable treatment than is required by the provisions of the present Convention

*Article 73*
*Relationship between the present Convention
and other international agreements*

1 The provisions of the present Convention shall not affect other international agreements in force as between States Parties to them.

2 Nothing in the present Convention shall preclude States from concluding international agreements confirming or supplementing or extending or amplifying the provisions thereof.

## CHAPTER V.
### FINAL PROVISIONS

### *Article 74*
*Signature*

The present Convention shall be open for signature by all States Members of the United Nations or of any of the specialized agencies or Parties to the Statute of the International Court of Justice, and by any other State invited by the General Assembly of the United Nations to become a Party to the Convention, as follows: until 31 October 1963 at the Federal Ministry for Foreign Affairs of the Republic of Austria and subsequently, until 31 March 1964, at the United Nations Headquarters in New York.

### *Article 75*
*Ratification*

The present Convention is subject to ratification. The instruments of ratification shall be deposited with the Secretary-General of the United Nations.

### *Article 76*
*Accession*

The present Convention shall remain open for accession by any State belonging to any of the four categories mentioned in article 74. The instruments of accession shall be deposited with the Secretary-General of the United Nations.

### *Article 77*
*Entry into force*

1. The present Convention shall enter into force on the thirtieth day following the date of deposit of the twenty-second instrument of ratification or accession with the Secretary-General of the United Nations.

2. For each State ratifying or acceding to the Convention after the deposit of the twenty-second instrument of ratification or accession, the Convention shall enter into force on the thirtieth day after deposit by such State of its instrument of ratification or accession

## Article 78
### Notifications by the Secretary-General

The Secretary-General of the United Nations shall inform all States belonging to any of the four categories mentioned in article 74:

(a)    of signatures to the present Convention and of the deposit of instruments of ratification or accession, in accordance with articles 74, 75 and 76;

(b)    of the date on which the present Convention will enter into force, in accordance with article 77

## Article 79
### Authentic texts

The original of the present Convention, of which the Chinese, English, French, Russian and Spanish texts are equally authentic, shall be deposited with the Secretary-General of the United Nations, who shall send certified copies thereof to all States belonging to any of the four categories mentioned in article 74.

IN WITNESS WHEREOF the undersigned Plenipotentiaries, being duly authorized thereto by their respective Governments, have signed the present Convention.

DONE at Vienna this twenty-fourth day of April, one thousand nine hundred and sixty-three

---